IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **SHARLENE GORE**, | : | CIVIL ACTION NO. 1:13-CV-2151 |
| Plaintiff | : | |
| | : | (Chief Judge Conner) |
| v. | : | |
| | : | |
| **CAROLYN W. COLVIN, ACTING** | : | (Judge Conner) |
| **COMMISSIONER OF SOCIAL** | : | |
| **SECURITY,** | : | |
| Defendant | : | |

## MEMORANDUM

### Introduction

Plaintiff Sharlene Gore has filed this action seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying Gore's claim for social security disability insurance benefits.

Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes. Gore met the insured status requirements of the Social Security Act through December 31, 2011. Tr. 46.[1]

Gore filed her application for disability insurance benefits on August 29, 2008, alleging that she became disabled on June 20, 2007. Tr. 270. Gore had been diagnosed with several impairments, including degenerative disc disease of the cervical spine, radiculopathy, herniated cervical discs with spinal cord compression,

---

[1] References to "Tr.__" are to pages of the administrative record filed by the Defendant as part of the Defendant's Answer.

and arthritis of the right shoulder.  Tr. 48, 803, 806.  On October 20, 2008, Gore's application was initially denied by the Bureau of Disability Determination.  Tr. 223.

A hearing was conducted by an administrative law judge ("ALJ") on January 7, 2013, where Gore was represented by counsel.[2]  Tr. 61-91.   On January 28, 2013, the ALJ issued a decision denying Gore's application.  Tr. 44-53.  On June 26, 2013, the Appeals Council declined to grant review.  Tr. 1.  Gore filed a complaint before this Court on August 14, 2013.

Gore appeals the ALJ's determination on three grounds: (1) the ALJ erred in rejecting the opinion of Gore's treating physician, (2) the ALJ erroneously rejected the opinion of an examining physician, and (3) the ALJ improperly discounted Gore's credibility.  For the reasons set forth below, the decision of the Commissioner is affirmed.

**Statement of Relevant Facts**

Gore was forty-three years of age at the time the ALJ rendered his decision; she has a high school education and is able to read, write, speak and understand the English language.  Tr. 453, 459.  Gore has past relevant work experience as a corrections officer, which is classified as medium, semi-skilled work.  Tr. 85.

---

[2] This was the third administrative hearing conducted in this matter.  Two prior hearings resulted in erroneous denials at step one based upon Gore's income level; both previous denials were remanded by the Appeals Council.  Tr. 44.

### A.   Gore's Physical Impairments

On June 20, 2007, Gore presented to the Pocono Medical Center emergency room after being assaulted while at work. Tr. 557. Gore complained of a sharp, stabbing posterior neck pain that was exacerbated by movement. Tr. 557-58. Gore was ambulatory with a steady gait and had no numbness, tingling, or weakness in any extremity. Tr. 558. Gore had tenderness to palpation in the cervical spinal region, and was diagnosed with a cervical strain. Tr. 559, 560.

On June 28, 2007, an MRI was performed on Gore's cervical spine. Tr. 596. This MRI revealed mild degenerative spondylosis[3] and a "small to moderate" central disc herniation at the C4-5 level. Id. There was also a straightening of the normal cervical lordosis, which was indicative of cervical muscle spasms. Id.

On August 28, 2007, Gore presented to Behzad Maghsoudlou, M.D. Tr. 624. Gore complained of constant, severe neck pain, stiffness, and a decreased range of motion in her neck bilaterally. Id. Gore's cervical and trapezius areas were tender to palpation with spasms present. Id. Gore had a limited range of motion in her right shoulder; she was only able to raise her arm to a horizontal level. Id. Gore continued to see Dr. Maghsoudlou throughout 2007 with substantially similar

---

[3] "Cervical spondylosis is a general term for age-related wear and tear affecting the spinal disks in your neck. As the disks dehydrate and shrink, bone spurs and other signs of osteoarthritis develop . . . In most cases, cervical spondylosis causes no symptoms. When symptoms do occur, they typically affect only the neck — causing pain and stiffness" Mayoclinic.org, Cervical Spondylosis Definition, *available at* http://www.mayoclinic.org/diseases-conditions/cervical-spondylosis/basics/definition/con-20027408 (last visited September 24, 2014).

3

complaints, although in late 2007 her neck pain began radiating down her upper right extremity. Tr. 618-23. Dr. Maghsoudlou consistently observed that Gore presented with symptoms of cervical radiculopathy.[4] Id.

On October 11, 2007, an MRI was performed on Gore's right shoulder. Tr. 589. This MRI revealed degenerative changes in the acromioclavicular and glenohumeral joints. Id. The MRI also demonstrated evidence of tendonitis. Id.

On December 31, 2007, James Kim, D.O. provided a right subacromial bursa injection to alleviate Gore's pain. Tr. 647. Gore reported that this injection only helped relieve her right shoulder pain for approximately twenty-four hours. Tr. 616. However, Gore reported that her medications, including OxyContin and Percocet, were helping with her pain. Tr. 610, 612. Gore also stated that physical therapy helped, to some extent, to alleviate her pain. Tr. 645.

Despite positive developments from physical therapy and pain medication, Gore continued experiencing radiating neck pain, and by early March 2008, she reported that the pain was becoming "quite debilitating." Tr. 565. Therefore, Gore presented to Robert Marrow, M.D. for a neurosurgical consultation. Tr. 565-67. While therapy kept Gore "functioning and moving," her neck pain continued to rate

---

[4] "Radiculopathy is a condition where one or more nerves or nerve roots are affected and do not work properly. The nerve roots are branches of the spinal cord. They carry signals to the rest of the body at each level along the spine. The nerve roots exit through holes (foramen) in the bone of spine on the left and the right. Radiculopathy can be the result of a disc herniation or an injury causing foraminal impingement of an exiting nerve (the narrowing of the channel through which a nerve root passes)." Zerbe v. Colvin, 3:12-CV-01831, 2014 WL 2892389, at n.6 (M.D. Pa. June 26, 2014) (citations omitted).

as a six to eight out of ten. Tr. 566. A physical exam revealed a "moderate amount of musculature asymmetry" and tenderness over the cervical region. Id. A Tinel's test was positive at the right wrist, and a Phalen's test produced numbness and tingling in Gore's fingers. Id.

Gore's cervical range of motion was limited to three degrees in all plains before she "experienc[ed] significant components of neck pain." Id. Gore's right hand grip strength was slightly weaker than the left hand. Id. Gore was able to tandem walk well, but a Spurling's maneuver produced "severe neck pain radiating down the posterior aspects of her right arm to the wrist." Id. Dr. Marrow concluded that, given the failure of conservative treatment measures, surgery would be an appropriate option for Gore. Tr. 569.

On March 11, 2008 a second MRI was performed on Gore's cervical spine. Tr. 581. This MRI again revealed a mild to moderate disc herniation at the C4-5 level. Id. The MRI revealed "probable bilateral C5 nerve root encroachment." Id. The MRI again identified probable cervical muscle spasms. Id.

On March 24, 2008, Gore returned to Dr. Kim for a follow-up appointment. Tr. 643. Gore reported that physical therapy was helping, but her pain returned "after she ha[d] been off physical therapy." Id. Dr. Kim noted tenderness and spasms over Gore's cervical and trapezius region, as well as tenderness at the right Erb's point. Id. Gore's range of motion was limited in her cervical lateral flexion and rotation. Id. Her shoulder strength was 4/5, her right elbow flexor and extensor strength was 4+/5, and her right grip strength was 4+/5. Id.

Gore continued to treat with Dr. Kim throughout the relevant period. Tr. 637-42, 673-80, 731-33, 738-40, 771-81, 787-810. Dr. Kim consistently noted tenderness and spasms in Gore's cervical and trapezius regions. Id. Gore's right shoulder muscle strength was rated between a 3+/5 and a 5/5; her grip strength and right arm strength generally fluctuated between at 4/5 and a 5/5. Id. Dr. Kim consistently noted a restricted range of motion in Gore's right shoulder; she was unable to raise her right arm higher than ninety or one hundred degrees. Id. At every appointment, Gore ambulated without assistance or gait deviation. Id.

By mid-2010, surgery was finally approved for Gore's cervical impairments. Tr. 774. Gore elected not to undergo surgery since her physical therapy had "been managing her fairly well." Id. In September 2010, Gore reiterated to Dr. Kim that she did not wish to undergo surgery. Tr. 772. She stated that physical therapy was "helping" and therefore she wished "to try to live with her condition." Id.

On February 18, 2011, an x-ray was taken of Gore's right shoulder, and an MRI was performed on Gore's cervical spine. Tr. 803-04, 806. The x-ray demonstrated "minimal degenerative arthritis" in Gore's acromioclavicular and glenohumeral joints. Tr. 806. The MRI revealed "[p]rogressive mild to moderate degenerative spondylosis and persistent moderate sized central disc herniation" at the C4-5 level, which resulted in "posterior displacement of the mildly compressed spinal cord and bilateral C5 nerve root encroachment." Tr. 803. At the C5-6 level, Gore was suffering from progressive mild to moderate degenerative spondylosis and a "tiny" central disc herniation. Id.

**B.    Residual Functional Capacity Assessments**

On October 16, 2008 Theodore Waldron, D.O. reviewed Gore's medical records and completed a physical residual functional capacity assessment. Tr. 664-70. Dr. Waldron opined that Gore was capable of lifting or carrying twenty pounds occasionally and ten pounds frequently. Tr. 665. Gore was limited in her ability to push or pull with her upper extremities, could only occasionally reach overhead, and could only occasionally perform handling activities with her right hand. Tr. 665-66. Dr. Waldron believed that Gore could occasionally crawl and could never climb ladders, ropes, or scaffolds. Tr. 666. He also believed that Gore should avoid concentrated exposure to wetness, humidity, noise, vibration, pulmonary irritants, hazards, or extreme temperatures. Tr. 667.

On November 19, 2008, Charles Levine, M.D. completed an independent medical examination of Gore in relation to her worker's compensation case. Tr. 745-47. Dr. Levine noted that Gore's neck was very stiff with a reduced range of motion in the cervical spine. Tr. 746. Gore's reflexes were intact, though her grip strength on the right side was "poor due to pain." Id. Dr. Levine opined that Gore was "totally disabled from work" as of June 20, 2007. Id. However, Dr. Levine believed that it was "entirely possible that [Gore] will be able to return to work as an officer. This will depend upon what residuals there are following the surgical process." Tr. 747.

On October 30, 2009, Dr. Kim opined that Gore could sit for five minutes at a time, for a total of two hours throughout an eight hour workday. Tr. 728. He

7

further opined that Gore could stand or walk for five minutes at a time, for a maximum of two hours during a workday.  Id.  Gore could rarely lift up to ten pounds, could never climb ladders, could rarely crouch, and could occasionally stoop, twist, or climb stairs.  Tr. 729.  Dr. Kim opined that Gore's pain was frequently severe enough to interfere with her attention and concentration, and believed that Gore was incapable of tolerating even low stress work.  Tr. 727.  Furthermore, Dr. Kim believed that Gore was likely to miss four or more days of work each month as a result of her physical impairments or treatment.  Tr. 730.  On December 1, 2009, Dr. Kim completed a form stating that Gore's physical impairments equaled Social Security listing 1.04.  Tr. 732-33.

    **C.**    **The Administrative Hearing**

At the administrative hearing, Gore testified that she had started working part-time in sedentary job for twenty-five hours each week.  Tr. 70, 75.  Gore interviewed inmates after they were released from custody, arranged for housing and other needs with social agencies, and coordinated with volunteers to provide services.  Tr. 71-72.  Gore testified that she generally did not need to drive more than ten miles away to conduct interviews; she worked from home and was able to set her own schedule.  Tr. 72, 75.  Gore did not believe that she would be able to work every day of the week.  Tr. 80-81.

Gore described her neck pain as "constant;" the only time her pain dissipated was after receiving epidural injections three times each year.  Tr. 72-73.  The pain began in her neck, but radiated down her back, shoulder, and upper right

extremity.  Tr. 74.  The pain increased if she stood or sat for too long, and Gore needed to brace her neck to help prevent pain.  Id.  However, Gore testified that with physical therapy, her pain was "tolerable."  Tr. 78.  Gore was unable to use her right hand for more than two minutes without her hand swelling.  Tr. 74.  Gore stated that she needed to reduce her medication because her medication caused problems with memory and thinking.  Tr. 73.

After Gore testified, Gerald Keating, an impartial vocational expert, was called to give testimony.  Tr. 84.  The ALJ asked Mr. Keating to assume a hypothetical individual with Gore's age, education, and work experience who was limited to sedentary work.[5]  Tr. 85-86.  The hypothetical individual was right-hand dominant and could not use her right upper extremity for overhead work, including pushing, pulling, or operating controls overhead.  Tr. 86.  The individual could do simple grasping and gross manipulation with her right hand at bench or table level.  Id.  She required a seated occupation, and could sit for six hours a day and walk or stand for two hours in a day.  Id.  The hypothetical individual could only be on her feet for ten to fifteen minutes at a time.  Id.  Finally, the individual was limited to simple, routine, and repetitive occupations.  Tr. 87.

---

[5] Sedentary Work is defined by the regulations of the Social Security Administration as work that "involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met."  20 C.F.R. § 416.967.

Mr. Keating opined that, given these restrictions, the hypothetical individual would be unable to perform Gore's past relevant work.  Id.  However, the individual would be capable of performing three jobs that exist in significant numbers in the national economy: an assembler of small products, a telephone receptionist, and a surveillance monitor.  Tr. 87-88. Mr. Keating testified that an individual would be unemployable if she would miss four or more days of work per month.  Tr. 89-90.

**Discussion**

In an action under 42 U.S.C. § 405(g) to review the Commissioner's decision denying a plaintiff's claim for disability benefits, the district court must uphold the findings of the Commissioner so long as those findings are supported by substantial evidence.  Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988) (quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance.  Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988).  In an adequately developed record substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter v. Harris, 642 F.2d 700, 706 (3d Cir. 1981), and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 203 (3d Cir. 2008). Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole. Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981).

The Commissioner utilizes a five-step process in evaluating disability insurance benefits claims. See 20 C.F.R. § 404.1520; Poulos v. Comm'r of Soc. Sec., 474 F.3d 88, 91-92 (3d Cir. 2007). This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity, (2) has an impairment that is severe or a combination of impairments that is severe, (3) has an impairment or combination of impairments that meets or equals the requirements of a listed impairment, (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. See 20 C.F.R. § 404.1520. The initial burden to prove disability and inability to engage in past relevant work rests on the claimant; if the claimant meets this burden, the burden then shifts to the

Commissioner to show that a job or jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. Mason, 994 F.2d at 1064.

### A. The ALJ's Evaluation of Physician Opinions

On appeal, Gore primarily argues that the ALJ erred in failing to give controlling or substantial weight to the opinion of Dr. Kim, Gore's treating physician. Gore further contends that the ALJ erred in not addressing Dr. Kim's opinion that Gore would miss four or more days of work per month due to her impairments or treatment. Gore also argues that the ALJ erred in dismissing the opinion of Dr. Levine, a one-time examining physician.

The preference for the treating physician's opinion has been recognized by the United States Court of Appeals for the Third Circuit. See, e.g., Morales v. Apfel, 225 F.3d 310, 316-18 (3d Cir. 2000). When the treating physician's opinion conflicts with a non-treating, non-examining physician's opinion, the administrative law judge may choose whom to credit in his or her analysis, but "cannot reject evidence for no reason or for the wrong reason." Id. at 317 (quoting Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999)).

In choosing to reject the evaluation of a treating physician, an administrative law judge may not make speculative inferences from medical reports and may reject treating physician's opinions outright only on the basis of contradictory medical evidence. Id. A treating physician's opinion must be given controlling weight where that opinion is "well-supported by medically acceptable clinical and

laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." 20 CFR § 404.1527 (d)(2).

The ALJ gave little weight to Dr. Kim's physical residual functional capacity assessment. Tr. 50. The ALJ reasoned that, though Dr. Kim was a treating source, his opinion was inconsistent with his own treatment records and was contradicted by Gore's activity levels. Id. The ALJ's decision was supported by substantial evidence.

Dr. Kim's treatment notes did not show diminished strength in Gore's lower extremities, and Dr. Kim consistently noted that Gore ambulated without assistance and without gait deviation. Tr. 637-42, 673-80, 731-33, 738-40, 771-81, 787-810. Gore did not require the use of an assistive device such as a cane. Tr. 449. Additionally, Dr. Kim consistently found that strength in Gore's upper left extremity was not diminished, and strength in the upper left extremity ranged from slightly diminished to full. Tr. 637-42, 673-80, 731-33, 738-40, 771-81, 787-810. These findings undercut the assertion that Gore was limited to standing or walking for only five minutes at a time, and that she could only rarely lift up to ten pounds.

Furthermore, Dr. Kim's opinion is at odds with Gore's self-reported activities and limitations. In her functional report, Gore stated that she was able to stand or walk for fifteen minutes at a time. Tr. 448. This directly contradicts Dr. Kim's assertion that Gore could walk or stand for only five minutes at a time. Tr. 728. Gore further reported that she was able to sit for up to twenty minutes at a time, and that she drove ten miles to conduct interviews as part of her job. Tr. 72, 448.

Both statements contradict Dr. Kim's opinion that Gore could only sit for five minutes at a time. Tr. 728. Additionally, the ALJ's conclusion was buttressed by the opinion of Dr. Waldron, who opined that Gore was capable of medium work and had no restrictions in her ability to sit, walk, or stand. Tr. 665.

Though the ALJ did not directly address Dr. Kim's opinion that Gore would miss four or more days of work per month, the ALJ did not err in this respect. The ALJ gave little weight to Dr. Kim's residual functional capacity assessment as a whole, and provided valid reasons for rejecting that opinion. Tr. 50. The statement that Gore was likely to miss four days of work each month was contained within the assessment that the ALJ rejected. Tr. 730. Thus, it is clear from the ALJ's opinion that he rejected Dr. Kim's opinion that Gore would miss on average four or more days of work each month.

The ALJ also gave little weight to Dr. Levine's opinion that Gore was "totally disabled." Tr. 51. The ALJ noted that Dr. Levine's opinion was based upon a single examination and was rendered in the context of a worker's compensation proceeding. Id.

The ALJ properly afforded less weight to Dr. Levine's opinion on the basis that his opinion was rendered in the context of a worker's compensation case. See, Hartranft v. Apfel, 181 F.3d 358, 362 (3d Cir. 1999) (holding that social security claims and worker's compensation claims operate under "different standards for determining disability" and therefore an opinion rendered in one proceeding is of "limited significance" in the other). See also, 20 C.F.R. § 404.1504. Additionally, the

14

length of a doctor's treating relationship with a claimant is one factor that an ALJ must consider in weighing the probative value of a doctor's opinion, and therefore the ALJ properly accounted for Dr. Levine's status as a one-time examiner. See, 20 C.F.R. § 404.1527(c).

Significantly, Dr. Levine did not render any analysis of Gore's functional limitations; rather, Dr. Levine's opinion consisted of a conclusory assertion that Gore was totally disabled. Tr. 746. The fact that Dr. Levin offered on an opinion as to Gore's ability to work significantly diminished the weight of his opinion. "Opinions on some issues, such as [a statement by a medical source that an individual is unable to work], are not medical opinions . . . but are, instead, opinions on issues reserved to the Commissioner . . ." 20 C.F.R. § 404.1527(d).

The Commissioner will not, and is not required to, give any "special significance to the source of an opinion on" whether an individual is able to work. Id. Consequently, the ALJ properly rejected Dr. Levine's opinion because it was based on a single examination, was rendered in the context of a worker's compensation case, and addressed a legal conclusion reserved exclusively for the Commissioner.

B.     **Evaluation of Gore's Credibility**

Gore also argues that the ALJ improperly discounted her credibility. Specifically, Gore contends that the ALJ erred in failing to fully account for Gore's long work history as a corrections officer.

If allegations of pain and other subjective symptoms are supported by objective medical evidence, an ALJ must "determine the extent to which a claimant is accurately stating the degree" of the subjective symptoms. Hartranft v. Apfel, 181 F.3d 358, 362 (3d Cir. 1999) (citing 20 C.F.R. § 404.1529(c)). An ALJ's credibility determination is entitled to deference by a district court because "he or she has the opportunity at a hearing to assess a witness's demeanor." Reefer v. Barnhart, 326 F.3d 376, 380 (3d Cir. 2003).

Where a claimant has a long and continuous work history, his or her "testimony as to his [or her] capabilities is entitled to substantial credibility." Dobrowolsky v. Califano, 606 F.2d 403, 409 (3d Cir. 1979). However, work history alone is not determinative of a claimant's credibility, and is only one of many factors that must be considered by the ALJ. E.g., Telesha v. Barnhart, 3:01-CV-2371, 2003 WL 22161584, at *9 n. 6 (M.D. Pa. Mar. 31, 2003).

It is clear from the ALJ's decision that he did in fact consider Gore's lengthy work history. The ALJ emphasized that "[t]he claimant has an excellent work history as a federal inmate systems operator monitoring inmates." Tr. 50. Nonetheless, the ALJ did not fully credit Gore's subjective complaints; rather, he found that Gore's complaints were only partially credible. Id. The ALJ credited Gore's subjective complaints to some extent by limiting Gore to simple, routine, repetitive occupations based on her complaints of pain and medication side effects. Tr. 48. The ALJ also accommodated Gore's subjective complaints by limiting Gore to standing—at most—two hours during a workday. Tr. 48-49.

16

A thorough reading of the ALJ's opinion demonstrates that the ALJ did account for Gore's long work history.  The ALJ gave some weight to Gore's testimony, and credited some of Gore's subjective complaints when formulating a residual functional capacity assessment.  While another fact finder may have reached a different conclusion, the ALJ's credibility determination was supported by substantial evidence.

**Conclusion**

A review of the administrative record reveals that the decision of the Commissioner is supported by substantial evidence.  Pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner affirmed.

An appropriate Order will be entered.

 /S/ CHRISTOPHER C. CONNER
Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania

Dated:       September 26, 2014